******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* LUIS A. GRAJALES
## (AC 39140)

Lavine, Keller and Pellegrino, Js.

*Syllabus*

Convicted of the crimes of assault in the first degree and carrying a pistol without a permit, the defendant appealed to this court. The defendant's conviction stemmed from his conduct in shooting the victim in the neck during the course of a physical altercation between members of the defendant's family and the victim's family at the victim's apartment complex. After the shooting, the defendant fled the scene of the crime, returned to his apartment, and claimed that he fell asleep. Despite the police searching the area of the defendant's apartment that night, the defendant remained hidden until the police searched his apartment the next day, at which time he was discovered and subsequently arrested. At trial, the defendant's theory of defense was one of justification in defense of others, in which he claimed that he shot the victim to protect his wife and daughter. On appeal, the defendant claimed that the court improperly instructed the jury on consciousness of guilt because the evidence did not reasonably support a finding of flight. *Held* that the defendant's claim that the prejudicial effect of the instruction on flight outweighed its probative value and affected the jury's consideration of his claim of defense of others was unavailing: although the defendant claimed that leaving the scene of a crime in an open or otherwise nonfurtive manner does not support a consciousness of guilt instruction on the basis of flight, the fact that the evidence might support an innocent explanation does not make an instruction on flight erroneous, there was no binding precedent that holds that returning home after an alleged crime precludes a court from instructing a jury on consciousness of guilt on the basis of flight, the evidence in the present case that the defendant left the scene of the shooting rather than waiting for the arrival of authorities supported a reasonable inference that he knew his actions were wrong in the eyes of the law and that he was hiding out in order to evade being apprehended by police, and the fact that he returned to his nearby basement apartment did not preclude that inference; moreover, the inference that flight reflected consciousness of guilt was enhanced by the evidence of what the defendant did between the time he got home and the time of his arrest, as this court, in determining whether the flight instruction was warranted, was permitted to review not only the evidence that the defendant left the scene of the shooting but also his furtive conduct at his apartment, the trial court did not act improperly by instructing the jury that the defendant's flight may have indicated a consciousness of guilt, and the jurors were free either to reject or to accept the evidence, and were not required to find that the defendant fled because he was guilty.

Argued November 27, 2017—officially released May 1, 2018

*Procedural History*

Substitute information charging the defendant with one count each of the crimes of assault in the first degree and carrying a pistol without a permit, and with three counts of the crime of risk of injury to a child, brought to the Superior Court in the judicial district of New Haven and tried to the jury before the court, *B. Fischer, J.*; verdict and judgment of guilty of assault in the first degree and carrying a pistol without a permit, from which the defendant appealed to this court. *Affirmed.*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Brian K. Sibley, Sr.*, senior assistant state's attorney, and *Karen A. Roberg*, assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Luis A. Grajales, appeals from the judgment of conviction, rendered after a jury trial, of one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (5)[1] and one count of carrying a pistol without a permit in violation of General Statutes § 29-35.[2] He claims that the court improperly instructed the jury on consciousness of guilt because the evidence does not reasonably support a finding of flight. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On August 22, 2014, Luis Perez (Perez) returned home from work to his apartment at Station Court in New Haven around 5 p.m. Perez lived with his wife, Jessica Rivera, and their four children—Chrystal Perez, Shelanie Perez, K, and L. On the evening of the incident, Perez and Rivera were joined by Grenda Camacho, a family friend, and her son, I.[3] Together, they ate dinner and sat outside their first floor apartment and watched their children play. Meanwhile, Chrystal studied inside the family apartment.

At the time of the incident, the defendant lived less than one mile away from Station Court at an apartment on Wilson Street. The defendant's former wife, Iris Figueroa, resided at Station Court in a second story apartment above the Perez residence. On August 22, 2014, the defendant went to Station Court to visit his children. Late in the evening hours of August 22, Perez began to argue with the defendant and his family. When the argument initially began, Perez stood outside his apartment in the courtyard and the defendant and his family were on the balcony of Figueroa's apartment overlooking the courtyard. At some point, Perez retrieved a ceramic ball from his apartment, which he threw toward the defendant. The ball did not make contact with anyone and landed harmlessly on the balcony. The defendant's daughter, Shakira Grajales, threw the ball back at Perez, but also did not hit anyone with it. The defendant came down from the balcony to the courtyard and the argument between the defendant and Perez intensified. K interrupted Chrystal from her studies to inform her that their father was outside arguing with the defendant and his family. Chrystal grabbed two baseball bats and placed them inside by the door in case any member of her family needed them for protection. She then went outside to the courtyard where she was approached by Shakira. Chrystal, fearing that Shakira intended to attack her, punched Shakira in the face. The two girls began fighting in the courtyard. Rivera attempted to break up the fight. When Rivera attempted to do so, Figueroa pulled Rivera to the ground by her hair and began hitting her.

The defendant and Perez were not involved in the physical fight in the courtyard. As the melee in the courtyard continued, the defendant went upstairs to Figueroa's apartment and retrieved a .22 caliber pistol. The defendant came back downstairs with the gun hidden behind his back. Camacho pleaded with the defendant not to shoot Perez because "the children were inside the [Perez] apartment." The defendant ignored her plea and entered the Perez residence. Inside, the defendant shot Perez in the neck.

Camacho ran outside screaming that the defendant had shot Perez. Chrystal entered the apartment and found her father on the floor covered in blood, struggling to stand up. K called 911 and handed the phone to Chrystal, who received instructions from the operator to apply pressure to the wound using a towel, which she did until paramedics arrived. After neighbors broke up the fight between Figueroa and Rivera, Rivera entered the apartment and found Perez lying on the floor. At this point, Rivera broke a glass bottle and grabbed one of the baseball bats that Chrystal had placed behind the door in order to protect her family from the defendant and his family.

After shooting Perez, the defendant left the scene at Station Court in Figueroa's Dodge Magnum. On the drive back to his Wilson Street apartment, the defendant got "scared," and removed the ammunition clip from the gun. Back at his apartment, the defendant locked himself in a basement bedroom, placed his gun in a bedside dresser, and went to sleep.

The gunshot fractured Perez' C7 vertebrae. He likely will never walk again.

The state charged the defendant with one count of assault in the first degree, one count of carrying a pistol without a permit, and three counts of risk of injury to a child in violation of General Statutes § 53-21.[4] At trial, the defendant's theory of defense was one of justification in defense of others, claiming that he shot Perez in order to protect Rivera and Shakira. The jury found the defendant guilty of assault in the first degree and possession of a pistol without a permit. The jury returned a verdict of not guilty on the three counts of risk of injury to a child. The court sentenced the defendant to a total effective sentence of twenty-five years incarceration, execution suspended after twenty-three years, followed by five years of probation.[5] This appeal followed. Additional facts will be set forth in our analysis of the defendant's claim.

The defendant's sole claim is that the court improperly instructed the jury on consciousness of guilt because the evidence does not reasonably support a finding of flight.

The record reflects that on October 13, 2015, the court held a charge conference in its chambers. There-

after, the court stated on the record: "I just want to review with counsel on the record. . . . We met in my chambers today, [October 13, 2015,] around 9 [a.m.] and we had a charge conference in chambers. . . . On Thursday, [October 8, 2015,] I had sent to counsel a proposed jury charge. They received another . . . installment correcting some of the original rough drafts on Friday, [October 9, 2015]. This weekend was Columbus Day weekend. I encouraged counsel to review the proposed charge, spend time on it, and give the court any suggestion, or recommendations, or request to charge. Both counsel have taken the court up on that and over the weekend I did receive first from—[defense counsel] two comments . . . . I will do that. . . . From the state's standpoint as I understand it, the state is requesting a consciousness of guilt charge specifically concerning an evidentiary issue of flight from the scene. Is that correct, [prosecutor]?

"[The Prosecutor:] Yes, Judge.

"The Court: And, [defense counsel], as I understand it you object to that charge?

"[Defense counsel:] I do, your Honor . . . [the defendant's] response . . . is a natural response to somebody in that particular situation. I don't think it rises to the level of consciousness of guilt. . . . "

The court noted the defendant's exception. During closing argument neither party offered arguments concerning the defendant's flight or consciousness of guilt. The court, during its jury charge, instructed the jury as follows: "I want to talk to you about consciousness of guilt. In any criminal trial it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense may have been influenced by the criminal act, that is, the conduct or statements show a consciousness of guilt. For example, flight, when unexplained, may indicate consciousness of guilt if the facts and the circumstances support it. Such facts do not, however, raise a presumption of guilt. If you find the evidence proved and also find that the acts were influenced by the criminal act and not by any other reason you may, but are not required to infer from this evidence, that the defendant was acting from a guilty conscience.

"The state claims that the following conduct is evidence of consciousness of guilt. The defendant's flight from . . . Station Court, New Haven, on August [22], 2014. It is up to you as judges of the facts to decide whether the defendant's acts if proved reflect a consciousness of guilt, and to consider such in your deliberations and conform with these instructions."[6]

The following evidence pertaining to flight was introduced at trial. The state introduced a videotape of Detective Gary Hammill interviewing the defendant on the morning after the shooting. During this interview,

the defendant stated that, after he shot Perez, he left Station Court in Figueroa's car, a white Dodge Magnum. The defendant said he travelled to his Wilson Street apartment, parked the car there, and immediately went inside to go to sleep. He said he heard the police searching at Wilson Street that night, but he did not reveal himself to the police and they did not find him in the basement. He stated that although the police entered the basement, they did not find him because they did not enter the room behind the green door. He also heard Figueroa's car being towed from the driveway. During the interview, the defendant repeatedly asserted that his actions after leaving Station Court were because he was afraid.

Police officers testified that when they arrived at Station Court on the night of the incident, the defendant was no longer present. Officer Eric Pesino testified that he went to Station Court because of a report of shots fired. Upon arriving at a chaotic scene, he learned that the defendant "took off" after shooting Perez. Detective Ann Mays testified that police officers, shortly after arriving at Station Court on the night of the incident, learned that the defendant may be at his Wilson Street apartment. Mays and other officers went to the Wilson Street apartment but could not find the defendant. Mays testified that the police communicated with someone in the basement apartment and ordered that everyone exit the house. The police requested identification from the people who came outside. Sergeant Colon stated that police searched the house, including the basement. The police did not find the defendant among the people they identified or inside the house. Mays also testified that she spotted "a cream colored Dodge Magnum" parked in the driveway at the Wilson Street apartment and that the hood of this car was warm.

Detective Juan Ingles testified about finding the defendant at the Wilson Street apartment the morning after the shooting. Ingles received a key to the home from the defendant's brother-in-law. Ingles and another officer entered the basement of the house and found a locked door. The officers banged on the door and identified themselves as members of the New Haven police department. The officers were told to enter and used the key to unlock the door. The officers cautiously entered the basement apartment with their weapons drawn because they suspected the defendant still had a gun. Inside, the police found the defendant lying down on a bed.

"We review a trial court's decision to give a consciousness of guilt instruction under an abuse of discretion standard. . . . Evidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight, concealment of evidence, or a false statement, is ordinarily the basis for a [jury] charge on the inference of consciousness of guilt." (Citation

omitted; internal quotation marks omitted.) *State* v. *Vasquez*, 133 Conn. App. 785, 800, 36 A.3d 739, cert. denied, 304 Conn. 921, 41 A.3d 661 (2012). "The decision whether to give an instruction on flight . . . should be left to the sound discretion of the trial court." *State* v. *Hines*, 243 Conn. 796, 816, 709 A.2d 522 (1998).

"Flight, when unexplained, tends to prove a consciousness of guilt. . . . Flight is a form of circumstantial evidence. . . . The probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury." (Citations omitted.) *State* v. *Thomas*, 50 Conn. App. 369, 382–83, 717 A.2d 828 (1998), appeal dismissed, 253 Conn. 541, 755 A.2d 179 (2000).

"[E]vidence of flight from the scene of a crime [is] inherently ambiguous. . . . That ambiguity does not render a flight instruction improper." (Citations omitted.) *State* v. *Luster*, 279 Conn. 414, 423, 902 A.2d 636 (2006). "If there is a reasonable view of the evidence that would support an inference that [the defendant fled] because he was guilty of the crime and wanted to evade apprehension—even for a short period of time— then the trial court is within its discretion in giving . . . [a flight] instruction . . . ." *State* v. *Scott*, 270 Conn. 92, 105–106, 851 A.2d 291 (2004), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005). "Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration." *State* v. *Piskorski*, 177 Conn. 677, 723, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979).

"The probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." (Internal quotation marks omitted.) *State* v. *Holley*, 90 Conn. App. 350, 361–62, 877 A.2d 872, cert. denied, 275 Conn. 929, 883 A.2d 1249 (2005).

In the present appeal, the defendant argues that the first inference—from behavior to flight—is not supported by the evidence and, thus, the court should not have provided the jury with the consciousness of guilt instruction. The state, in response, argues that the evidence is sufficient to support the consciousness of guilt instruction. We agree with the state.

The defendant argues that "flight means more than merely leaving the scene of a crime; it presupposes a

nefarious motive for leaving," or in other words, mere departure from the scene of a crime is insufficient evidence to support a jury instruction on consciousness of guilt on the basis of flight.[7] No Connecticut appellate case, however, has held that flight requires proof of more than departure from the scene of the crime or a nefarious purpose for leaving. To the contrary, our case law addressing whether there is sufficient evidence to support a consciousness of guilt instruction on the basis of flight upholds the proposition that the instruction is warranted even when the evidence reveals little more than mere departure.[8] *State* v. *Asberry*, 81 Conn. App. 44, 57, 837 A.2d 885 (evidence defendant left scene of crime because he expected someone to drive him home and victim saw defendant leave scene in tan colored car that was later stopped sufficient to support flight instruction), cert. denied, 268 Conn. 904, 845 A.2d 408 (2004); see also *State* v. *Adams*, 36 Conn. App. 473, 481, 651 A.2d 747 (evidence defendant got into his car and left scene and police officer saw defendant driving rapidly away from scene sufficient to support flight instruction), appeal dismissed, 235 Conn. 473, 667 A.2d 796 (1995).

We are not persuaded by the defendant's assertion that evidence of leaving the scene of a crime in an open, or otherwise nonfurtive, manner does not support a consciousness of guilt instruction on the basis of flight. Although the paradigm examples of flight expressing consciousness of guilt may involve fleeing the country or a complex ruse to avoid law enforcement, there is no requirement that a defendant's departure from the scene of a crime involve such a circumstance. See *State* v. *Asberry*, supra, 81 Conn. App. 57. Our case law repeatedly acknowledges that "evidence of flight from the scene of a crime inherently is ambiguous"; *State* v. *Luster*, supra, 279 Conn. 423; and "[t]he fact that the evidence might support an innocent explanation . . . does not make an instruction on flight erroneous." (Internal quotation marks omitted.) *State* v. *Silva*, 113 Conn. App. 488, 496–97, 966 A.2d 798 (2009).

We now address the defendant's argument that the "mere return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt." The defendant supports this contention by referring to the evidence that after the shooting he went to his own home, which was less than one mile away from Station Court, and went to sleep. We first observe that no binding precedent holds that returning home after an alleged crime precludes a court from instructing a jury on consciousness of guilt on the basis of flight. Instead, prior cases have affirmed that an instruction on flight is proper when the defendant returns to his place of residence. *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986); *State* v. *Thomas*, supra, 50 Conn. App. 383–84.

In *Wright*, the defendant and the victim got into an argument over a drug transaction. *State* v. *Wright*, supra, 198 Conn. 276. According to the defendant in *Wright*, the victim threatened him with a knife. Id. In response, the defendant, acting in self-defense, wrestled the victim to the ground. Id. The victim was stabbed twice in the chest during the ensuing struggle. Id. There was evidence that the defendant in *Wright*, after stabbing the victim, "ran to his mother's house, where he was living at the time, changed his clothes and wiped up blood. He then went to his sister-in-law's apartment, where he was apprehended by the police the next day." Id., 281. On the basis of this evidence, "[t]he jury could have found that this conduct constituted evidence of flight which tended to show a consciousness of guilt." Id.

The evidence also supported an instruction of flight in a case in which the defendant, after stabbing someone, rode his bicycle to his mother's house, where he resided. *State* v. *Thomas*, supra, 50 Conn. App. 383–84. In *Thomas*, the defendant spotted the victim toting a boom box that the defendant suspected the victim had stolen from him. Id., 371. The defendant confronted the victim about the boom box and the two began to fight. Id. During the altercation, the defendant stabbed the victim in the chest. Id. "[I]mmediately after the victim had been stabbed, the defendant rode a bicycle to his mother's house." Id., 383. This court concluded that "[t]he evidence of flight in this case tended to show that the defendant believed that what he had done was not merely an act of self-defense, but was something that was considered wrong in the eyes of the law. . . . [T]he evidence of flight was sufficient to allow the jury to infer consciousness of guilt . . . ." Id., 384.

*Wright* and *Thomas* both held that there was sufficient evidence to support a consciousness of guilt instruction on the basis of flight when each defendant returned to his place of residence. We do not see a reason to distinguish the defendant in the present case departing Station Court for the apartment where he had been residing from the defendants in *Wright* and *Thomas* fleeing to their mothers' homes where they had been residing. In light of the particular circumstances, evidence of returning home after committing an act of violence can still evince that a "defendant believed that what he had done was not merely an act of self-defense, but was something that was considered wrong in the eyes of the law." Id., 384. At trial, the defendant relied on the theory that he shot Perez in defense of others. The evidence that the defendant left the scene of the shooting rather than waiting for the arrival of authorities supported a reasonable inference that the defendant knew his actions were wrong. The fact that there was evidence that he returned to his nearby basement apartment does not preclude this inference.

Furthermore, we are not persuaded by the defendant's argument that our review of whether the evidence supports the flight instruction should be limited to the fact that the defendant left Station Court and went to his Wilson Street apartment after the shooting. The defendant contends that because the court instructed the jury to consider the defendant's "flight from . . . Station Court," and did not delve into the evidence of his conduct at his Wilson Street apartment, the evidence in support of the court's decision to give the flight instruction is limited merely to the fact that the defendant departed from the scene. "The probative value of evidence of flight [however] depends upon all the facts and circumstances and is a question of fact for the jury." *State* v. *Nemeth*, 182 Conn. 403, 408, 438 A.2d 120 (1980). The defendant's departure from the scene and his actions immediately following the shooting support a conclusion that when the defendant left the scene and went home, he was not simply waiting for things to calm down before going to the police, as he claimed. Rather, he was hiding out in order to evade apprehension because he knew he had not been justified in shooting Perez to protect his family but had done something wrong in the eyes of the law.

Therefore, we conclude that our analysis as to whether the flight instruction was warranted permits us to review not only the evidence that the defendant left Station Court, but also his furtive conduct at his apartment on Wilson Street in the early hours of August 23, 2014. Specifically, there was evidence that the defendant removed the ammunition clip from his gun and hid it in his bedside dresser. He knew the police arrived at his Wilson Street apartment searching for him and towed Figueroa's car from the parking lot. Yet, the defendant stated that he opted to remain hidden in the basement apartment out of fear. Thus, contrary to the defendant's assertion, there is evidence that the defendant fled Station Court in a "furtive" manner because he hid from the police while they searched for him on the night of the shooting. The inference that flight reflected consciousness of guilt is enhanced by the evidence of what the defendant did between the time he got home and the time of his arrest.

The standard for whether a flight instruction is appropriate is whether there is a reasonable, and not a compelling, view of the evidence that supports it. In the present case, the court did not act improperly by instructing the jury that the defendant's flight from Station Court may indicate consciousness of guilt. The evidence was sufficient to support a finding that, despite claiming that he acted to protect his family, the defendant fled from the scene of the crime after shooting Perez inside of his apartment while their families argued outside and despite the fact that Shakira and Figueroa were injured. There is no evidence that

the defendant paused before fleeing to ensure that his family was all right or inquired about their well-being later that night. Instead, the defendant drove off and locked himself in his basement apartment. When police arrived at his apartment on Wilson Street around 1 a.m., he was aware of their presence, but he elected to remain hidden and was not found until the next morning. That morning, he did not respond when the police banged on the door and was not apprehended until the police obtained the keys to his basement apartment from his brother-in-law. This narrative reasonably supports the court's decision to provide the jury with consciousness of guilt instruction on the basis of flight. The evidence of flight in this case was sufficient to show that the defendant believed what he had done was not merely done to protect Shakira and Rivera as he claimed, but something that was considered wrong in the eyes of the law. The evidence of flight permitted the jury to infer a consciousness of guilt on behalf of the defendant. See *State* v. *Thomas*, supra, 50 Conn. App. 384.

In considering the evidence, the jurors were free to either reject it or to accept it as they saw fit. They were not required to find that the defendant fled because he was guilty. See id., 384. Accordingly, we find no merit to the defendant's assertion that the prejudicial effect of the instruction on flight outweighed its probative value and affected the jury's consideration of the defendant's claim of defense of others.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm. . . ."

[2] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[3] K, L, and I were the alleged minor victims in three charges of risk of injury to a child brought against the defendant in connection with this incident. In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identifies may be ascertained. See General Statutes § 54-86e.

[4] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of (A) a class C felony for a violation of subdivision (1) . . . of this subsection . . . ."

[5] The court sentenced the defendant to twenty years incarceration, execution suspended after eighteen years, followed by five years of probation on the assault conviction and five years of incarceration on the carrying a pistol without a permit conviction, to be served consecutively to the assault sentence.

[6] The defendant is not challenging the contents of the instruction, only the decision to give it.

[7] The defendant refers to this principle that mere departure from the scene of a crime is insufficient evidence to support a jury instruction on consciousness of guilt on the basis of flight as the "mere departure rule."

[8] The defendant derives the so-called "mere departure rule" from case law from other jurisdictions. The authority on which the defendant relies, however, does not convince us to follow the "mere departure rule" because it is not the law in this state. See *State* v. *Asberry*, 81 Conn. App. 44, 57, 837 A.2d 885, cert. denied, 268 Conn. 904, 845 A.2d 408 (2004). In addition, out of state authority does not provide a persuasive basis to conclude that the trial court erred by providing a flight instruction. The two out of state cases on which the defendant relies conclude that there was insufficient evidence to support a consciousness of guilt instruction on the basis of flight, are factually dissimilar from the present case, and are, thus, unpersuasive. See *Hoerauf* v. *State*, 941 A.2d 1161, 1180 (Md. App. 2008) and *State* v. *Ingram*, 951 A.2d 1000, 1015 (N.J. 2008).

In *Hoerauf*, the defendant "simply walked away from the scene of the crime with the group of individuals who had just perpetrated the robberies. When [the defendant] left the scene, the police had not arrived, nor was their arrival imminent. There was no evidence that [the defendant] attempted to flee the neighborhood or to secrete himself from public view to avoid apprehension. Indeed, only 10–15 minutes after the crime, the police stopped [the defendant] in a nearby neighborhood with three of the other perpetrators, one of whom possessed some of the stolen property. . . . Accordingly, [the defendant's] behavior did not constitute flight, and the trial court erred in giving the flight instruction." *Hoerauf* v. *State*, supra, 1180. The factual situation in *Hoerauf* differs significantly from the evidence in the present case. There is evidence in the present case that the defendant was not apprehended for over eight hours after shooting the victim, the defendant left the neighborhood of the crime, and the defendant hid from police.

In *Ingram*, a consciousness of guilt instruction was also deemed improper. The defendant's flight, however, occurred after his trial began. On appeal, the New Jersey Appellate Court noted that a defendant leaving during the middle of a trial differs from leaving after the commission of an alleged crime for the purpose of determining whether there is sufficient evidence for a flight instruction: "The logically required tipping point—departure to avoid detection or apprehension—is absent here: by the time defendant voluntarily absented himself from any portion of the trial, he already had been arrested, indicted, admitted to bail, arraigned, had attended pre-trial hearings, and had attended at least one court-scheduled conference. Thus, from a purely definitional basis, a flight charge should not lie when a defendant absents himself from trial unless separate proofs are tendered to sustain the claim that the defendant's absence was designed to avoid detection, arrest, or the imposition of punishment." *State* v. *Ingram*, supra, 951 A.2d 1015.

---